UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RUSTICO SIAZON,

           Plaintiff,

v.

THE HERTZ CORPORATION,

           Defendant.

Case No. 17-cv-05935-EMC

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Docket No. 43

Plaintiff Rustico Siazon is a former employee of Defendant The Hertz Corporation. Hertz terminated his employment in October 2015. Mr. Siazon has sued Hertz for, *inter alia*, age discrimination, retaliation, and defamation. Currently pending before the Court is Hertz's motion for summary judgment. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Hertz's motion.

## I.      FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties reflects as follows.

Mr. Siazon is more than 60 years old and worked for Hertz for more than twenty years. When Mr. Siazon first started at Hertz's SFO location, he was a Customer Service Representative. He became a Payroll Clerk in or about June 2012. He was working as a Payroll Clerk when he was terminated in October 2015.

During the relevant period:

- Masha Schneider was the Human Resources Business Partner at SFO.
- Jaimie Tison, also a Human Resources Business Partner, appears to have been Ms. Schneider's supervisor.

- Bernadette Jocson-Hynson was the Senior or Lead Payroll Clerk.
- Brenda Kim was the Location Manager.
- Rosanna Nuti was the City Operations Manager.
- Clayton Hopkins was the General Manager.

According to Hertz, the persons involved in the decision to terminate were Mr. Hopkins, Ms. Schneider, and Ms. Nuti. *See* Figari Decl., Ex. H (response to Interrogatory No. 2).

While Mr. Siazon was still working as a Customer Service Representative – *i.e.*, before he became a Payroll Clerk – he was issued multiple verbal warnings. *See* Dolinko Decl., Ex. I (verbal warning for tardies, dated 4/6/2010); Dolinko Decl., Ex. H (training advisory for inaccurate work, dated 10/29/2010); Dolinko Decl., Ex. G (verbal warning for patterned absences, dated 2/3/2011); Dolinko Decl., Ex. F (verbal warning for counter etiquette, dated 8/9/2011); Dolinko Decl., Ex. E (verbal warning for absences, dated 10/19/2011).

After Mr. Siazon became a Payroll Clerk in or about June 2012, he was also issued multiple written warnings. For example:

- September 7, 2012. The written warning stated that Mr. Siazon had failed "to comply with the Western Region Rules and Regulations. On Thursday, August 30, 2012, you took the VSAs [Vehicle Service Attendants] and Drivers timecards home. Your failure to properly secure and protect the company assets resulted in a missing timecard that cannot be found." Dolinko Decl., Ex. J (written warning). The written warning was issued by Major Sanders, the Area Operations Manager. *See* Figari Decl., Ex. A (Nuti Depo. at 17) (testifying that, for a time, she and Mr. Sanders were Co-City Operations Managers).
- January 8, 2013. The written warning stated that Mr. Siazon had taken an "unauthorized vacation day on January 3, 2012. You failed to submit [a] request and get manager approval prior to taking your vacation day." Dolinko Decl., Ex. K (written warning). The written warning was issued by Ms. Nuti. This was the only written warning that Mr. Siazon refused to sign. *See also* Dolinko Decl., Ex. A (Siazon Depo. at 102-03) (testifying that he did obtain approval).

- February 4, 2013. The written warning stated that it was a second warning for "continued failure to comply with the Western Region Rules and Regulations. On January 28, 2013, you sent an email with employees' confidential information to unauthorized personnel. Your failure to properly secure and protect the company assets resulted in compromised data." Dolinko Decl., Ex. L (written warning). The written warning was issued by Ms. Nuti.

- September 19, 2013. The written warning stated that it was "poor job performance. [¶] On July 8, . . . July 30, . . . and September 6, 2013, you failed to match VDA/VIR [Vehicle Damage Appraisal/Vehicle Incident Report] which caused the SFO location to have a low score among the top Hertz airport locations. Our weekly minimum is 60% and currently we are in [the] red because we did not meet our score. [¶] Also, you were told to put together the staffing binder for 2012 and 2013 which you failed to do." Dolinko Decl., Ex. M (written warning). The written warning was issued by Ms. Nuti.

On September 24, 2013 – *i.e.*, a few days after the written warning above about poor job performance from Ms. Nuti – Mr. Siazon wrote a memo to Bob Smith, the then-General Manager. The memo was Mr. Siazon's "formal complaint of intimidation and harassment by Bernadette Hynson-Jocson [the Senior or Lead Payroll Clerk], made possible with the approval of Rosanna Nuti." Dolinko Decl., Ex. U (complaint). The memo did not provide specifics about the intimidation and harassment, but Mr. Siazon indicated that he had not been "treated fairly and with respect." Dolinko Decl., Ex. U). Mr. Siazon asked for the opportunity to speak to Mr. Smith "personally in detail as to why I feel this way before any action is initiated." Dolinko Decl., Ex. U). According to Mr. Siazon, he subsequently met with Mr. Smith as well as a senior Human Resources employee (Larry Keyes). *See* Dolinko Decl., Ex. A (Siazon Depo. at 164).

Thereafter, for almost a year, nothing of significance took place. Then, on July 24, 2014, Mr. Siazon wrote a memo to Mr. Hopkins, who was now the General Manager at SFO. The memo was Mr. Siazon's "formal complaint of intimidation and harassment" by Ms. Kim, the Location Manager. Dolinko Decl., Ex. V (complaint). According to Mr. Siazon, a few days

3

earlier, Ms. Kim came up to him "without any cordiality" and "ordered me to open my email."
Dolinko Decl., Ex. V). There was an email from Ms. Nuti telling Mr. Siazon to start working on
"VSA productivity tracking." Dolinko Decl., Ex. V. Before Mr. Siazon could ask any questions,
Ms. Kim also told him that he needed "to do the 7 day No-Rev." Dolinko Decl., Ex. V. Mr.
Siazon stated that Ms. Kim seemed angry and that "her demeanor was a very humiliating
experience." Dolinko Decl., Ex. V. Mr. Siazon and Ms. Kim then had a discussion regarding his
assigned workdays – *e.g.*, why Ms. Kim had removed him from weekends off and why she had
assigned him No-Rev on days that the task was difficult to do. Ms. Kim refused to change his
schedule and then "instructed me to submit to her what I do every day stating the number of hours
it took me to finish." Dolinko Decl., Ex. V. After Ms. Kim left, Mr. Siazon asked a co-worker if
she had to "report what she does, stating the number of hours to finish." Dolinko Decl., Ex. V.
The co-worker said "no." According to Mr. Siazon, after he complained to Mr. Hopkins, Mr.
Hopkins said that he had spoken with Ms. Kim and that it would not happen again. *See* Dolinko
Decl., Ex. A (Siazon Depo. at 190, 192).

     Several months later, another written warning was issued to Mr. Siazon.

- November 14, 2014. The written warning stated that it was for "poor job
  performance. [¶] You recently requested vacation on November 16th and 17th.
  Before a manager had given authorization for this request, you purchased airline
  tickets as if you were granted the time off. In fact, your co-worker still has not
  been trained to replace you and some of your projects are overdue." Dolinko Decl.,
  Ex. N (written warning). Because Mr. Siazon had already purchased tickets, he
  was allowed to take the time off but, according to the warning, his actions had
  "put[] an unnecessary strain on the operation." Dolinko Decl., Ex. N. The written
  warning was issued by Ms. Kim. Although, at his deposition, Mr. Siazon testified
  that he did have approval for the vacation, *see* Dolinko Decl., Ex. A (Siazon Depo.
  at 112), at the time, he signed the written warning.

It appears that, by March 2015, Hertz management was contemplating a Performance
Improvement Plan ("PIP") for Mr. Siazon. This is suggested by a March 12, 2015, email written

1    by Ms. Jocson-Hynson to Ms. Nuti (with a copy to Ms. Schneider of Human Resources).  In the

2    email, Ms. Jocson-Hynson forwarded an email that she had written to Mr. Siazon and asked Ms.

3    Nuti to "[p]lease add to PIP."  Figari Decl., Ex. A (Ex. A-113) (email from Ms. Jocson-Hynson).

4    The email to Mr. Siazon concerned a purported error that he had made and that he then failed to

5    fully correct.

6        Approximately a month thereafter, Mr. Siazon was issued a final written warning on job

7    performance.

8        • April 16, 2015.  The final written warning on job performance stated in relevant

9            part as follows: "On April 02, 2015 I copied you on an email giving specific

10           instructions that you bring over attendance records of a DTG VSA to B. Jocson-

11           Hynson to review possible disciplinary action.  I asked on the email for you to

12           respond for compliance and you did.  To this date you have yet to execute my

13           instructions."  Dolinko Decl., Ex. O (final written warning).  The final written

14           warning was issued by Ms. Nuti.

15       After the final written warning was given to Mr. Siazon, Ms. Schneider sent an email to

16   Ms. Nuti, stating that Mr. Siazon was upset about the warning and wanted to speak with Mr.

17   Hopkins:

18           Rusty [Mr. Siazon] is under the impression that he is working "very
             hard" and we are picking on him.  He [said] that he and [Ms.
19           Jocson-Hynson] are not getting along and "it is personal" and we are
             trying to term [*i.e.*, terminate] him. . . . At first he didn't want to sign
20           his letter and I told him that he can put "refused to sign" but he
             signed at the end.
21
             If we want to term him, I need to submit email with all the
22           documentations to Jaimie [Tison of Human Resources] for her
             approval.
23

24   Figari Decl., Ex. A (Ex. A-116) (email from Ms. Schneider, dated April 16, 2015).  Mr. Siazon

25   was not yet terminated.

26       Approximately two months later, on June 10, 2015, Mr. Hopkins sent an email to Ms.

27   Schneider and Ms. Nuti.  In the email, he asked: "Do we have enough to complete RIF [reduction

28   in force] for Rustico Saizon [sic] and [another individual] on performance.  [Ms. Nuti] indicated

1  that Rusti is on Final Written Warning notice and that [the other individual] will receive a Final

2  Written for the incident with [the co-workers]."  Figari Decl., Ex. A (Ex. A-117) (email from Mr.

3  Hopkins).

4       Again, Mr. Siazon was not terminated but, several months later, on September 17, 2015,

5  Mr. Siazon was placed on a thirty-day PIP.

6       • September 17, 2015.  The thirty-day PIP started on September 17, 2015, and ended

7       October 19, 2015.  According to the PIP, "[t]he areas that are considered

8       substandard and must be corrected and improved are": (1) "Timeliness of work"

9       (*e.g.*, Hiker rate increases, union dues, attendance records); (2) "Accuracy of work"

10       (*e.g.*, payroll calculations, seniority placement, employee numbers, timecards,

11       attendance); and (3) "Following directions" (from managers, Human Resources,

12       and the Senior Admin Clerk).  Dolinko Decl., Ex. P (PIP).  The PIP stated that

13       "substandard performance displayed by you at any time during this period for any

14       conduct, including but not limited to the areas identified above, will result in your

15       termination."  Dolinko Decl., Ex. P.  The PIP was issued by Ms. Nuti.

16       Mr. Siazon met with Ms. Nuti and Ms. Schneider regarding the PIP.  According to Mr.

17  Siazon, he told Ms. Nuti and Ms. Schneider at the meeting that "'[t]his is a demolition job.  You

18  are using this letter to eventually get rid of me.'"  Dolinko Decl., Ex. A (Siazon Depo. at 119).

19  Mr. Siazon also claims that he subsequently spoke to Mr. Hopkins about the PIP and it being a

20  demolition job and that Mr. Hopkins assured him that he would be fine.  *See* Figari Decl., Ex. B

21  (Ex. B-129) (email from Mr. Siazon).

22       According to Ms. Schneider, Ms. Nuti was supposed to monitor Mr. Siazon on the PIP.

23  *See* Figari Decl., Ex. D (Schneider Depo. at 40-41).  The guidance from Human Resources was

24  that, "once the PIP is given to the employee and they are clear on the instructions of what needs to

25  be done in the whatever timeframe it was that they have . . . to improve upon, then weekly check-

26  ins or, you know, daily check-ins, whatever it takes to see how they're progressing is taking

27  place."  Figari Decl., Ex. A (Nuti Depo. at 73).  Follow-ups with employees were to be

28  documented.  *See* Figari Decl., Ex. A (Nuti Depo. at 74).  However, according to Ms. Nuti, even

though she had issued the PIP, she was not thereafter a part of the process because she was transitioning to the General Manager position at Sacramento. *See* Figari Decl., Ex. A (Nuti Depo. at 73-74, 107, 112). There is no evidence that anyone monitored Mr. Siazon in the place of Ms. Nuti. *See, e.g.*, Figari Decl., Ex. B (Hopkins Depo. at 48) (testifying that he did not know if – given Ms. Nuti's transitioning – anyone was tasked with following up on the PIP with Mr. Siazon; adding that he did not have a direct role in following up with Mr. Siazon on the PIP).

There is some evidence, however, that Mr. Siazon was attempting to comply with the PIP. On October 1, 2015, Mr. Siazon wrote an email to Ms. Jocson-Hynson (with a copy to Mr. Hopkins) regarding a possible overpayment to an employee. *See* Figari Decl., Ex. C (Ex. C-54) (email from Mr. Siazon). The following day, Ms. Jocson-Hynson wrote an email to Ms. Schneider, noting, *inter alia*, that there was no problem and that Mr. Siazon had not flagged the issue "until he got the PIP. So, he is 6 months late in his reconciliation report. He is also pushing the fact that he was unaware [of certain facts underlying the alleged problem]." Figari Decl., Ex. C (Ex. C-54) (email from Ms. Jocson-Hynson). Mr. Hopkins subsequently sent an email to Ms. Schneider stating that Mr. Siazon's actions "should be expected" because he had discussed the PIP with Mr. Siazon and told Mr. Siazon that "he must be thorough in his reports and to ensure that he double checks his work for accuracy. . . . I told him to be proactive in reporting discrepancies first so that it shows that he is auditing his work. I believe he means to fix an error in corrective action?" Figari Decl., Ex. C (Ex. C-53) (email from Mr. Hopkins). Ms. Schneider forwarded Mr. Hopkins's email to Ms. Jocson-Hynson with the following text: "FYI ☺." Figari Decl., Ex. C (Ex. C-53) (email from Ms. Schneider).

Within a few weeks, however, it appears that the decision was made to terminate Mr. Siazon. In his deposition, Mr. Hopkins indicated that the decision to terminate had been made as of October 13, 2015. *See* Figari Decl., Ex. B (Hopkins Depo. at 101); *see also* Figari Decl., Ex. B (Ex. B-136) (email from Ms. Jocson-Hynson) (indicating that Mr. Siazon was going to be terminated so that his access to a certain program needed to be terminated).

On October 19, 2015, *i.e.*, the last day of the PIP period, Mr. Siazon was issued a termination letter "for poor job performance." Dolinko Decl., Ex. Q (letter). The letter was

signed by Mr. Hopkins.  *See also* Figari Decl., Ex. D (Schneider Depo. at 33) (testifying that the General Manager would evaluate whether the employee had successfully completed the PIP).

In her deposition, Ms. Schneider testified that she met with Mr. Hopkins about whether Mr. Siazon had complied with the PIP.  The decision to terminate was made because Mr. Siazon's performance was not improving – *e.g.*, time cards were still being processed incorrectly, union dues were still not done, and so forth.  *See* Dolinko Decl., Ex. C (Schneider Depo. at 41-43).  Ms. Schneider noted specifically that she herself worked on the union dues because "[t]hey were still not done."  Dolinko Decl., Ex. C (Schneider Depo. at 43).  Ms. Schneider also testified that the Legal Department was consulted about one or two weeks before the termination and "we got the OK from the legal to do it."  Dolinko Decl., Ex. C (Schneider Depo. at 89).

At the time Mr. Siazon was terminated, there were four people who worked as Payroll Clerks: Ms. Jocson-Hynson, Mr. Siazon, Arminda ("La La") Dizon, and Analyn Alfonso.  *See* Figari Decl., Ex. A (Nuti Depo. at 56); Figari Decl., Ex. C (Jocson-Hynson Depo. at 50); Dolinko Decl., Ex. R (investigation notes on complaint).  Ms. Jocson-Hynson was the Senior or Lead Payroll Clerk.  Mr. Siazon was in charge of the hiker payroll and Ms. Dizon was in charge of the VSA payroll.  Ms. Alfonso assisted in fleet, and she also assisted the other three Payroll Clerks as necessary.  *See* Figari Decl., Ex. C (Jocson-Hynson Depo. at 50).  After Mr. Siazon was terminated, Ms. Alfonso took over Mr. Siazon's responsibility for the hiker payroll.  *See* Figari Decl., Ex. D (Jocson-Hynson Depo. at 54).  In contrast to Mr. Siazon, who was in his 60s, Ms. Alfonso was in her 30s.  *See* Siazon Decl. ¶ 2.

Ultimately, the termination letter was not given to Mr. Siazon on October 19, 2015, because Mr. Siazon left early that day after not feeling well.  According to Mr. Siazon, he became sick because he learned that he was going to be terminated; he determined that he was going to be terminated based on his payroll information which indicated that he was "missing some hours."  Dolinko Decl., Ex. A (Siazon Depo. at 94); *see also* Figari Decl., Ex. B (Ex. B-128) (email from Mr. Siazon) (stating that "I just found out today that I was terminated[;] [a]s I was working on the SFO Weekly Reports I was missing some hours not knowing that those hours were requested for my termination").

Apparently, on or about October 26, 2015, Mr. Siazon received the termination letter in the mail.  *See* Dolinko Decl., Ex. A (Siazon Depo. at 144).  Around the same time, Mr. Siazon had a conversation with Mr. Hopkins and/or Ms. Schneider during which it was confirmed that Mr. Siazon had been terminated on October 19, 2015.[1]  *See* Dolinko Decl., Ex. Y (email from Mr. Siazon).

In the meantime, Mr. Siazon made three complaints to Hertz on its complaint "hotline."  Each of these complaints was made after October 19, 2015 (*i.e.*, the termination date).

- October 21, 2015.  In this complaint, Mr. Siazon asserted that Joseph Magri, a Transporter, was being favored and was engaging in wasteful conduct.  *See* Dolinko Decl., Ex. R (complaint).  The complaint was investigated, and it was determined that the complaint was not substantiated.  *See* Dolinko Decl., Ex. R).

- October 27, 2015.  In this complaint, Mr. Siazon claimed that he was never given a pay increase, without any explanation why, once he started his job as an Office Clerk (*i.e.*, Payroll Clerk) in June 2012.  Mr. Siazon noted that, eventually, he was given a raise in April 2015 but his increase was "way below other Officer Clerks['] increases."  Dolinko Decl., Ex. S (complaint).  The complaint was investigated by several persons, including Ms. Tison of Human Resources.  The complaint was found partially substantiated.  According to the investigation notes, Mr. Siazon "was transferred into the Back Office clerk at [SFO] in May 2012.  Prior to this transfer he [was] a Counter Sales Rep, struggling in performance which is why he was moved to the clerk position.  Since 2012 and being trained and coached by other clerks and Managers[,] [Mr.] Siazon still continued to struggle with his administrative duties which resulted [in] the withholding of his annual merit increase in 2013 and 2014.  Unfortunately, there is not enough documentation on file that supports his performance was poor or it had been communicated to him that he would not be receiving the merit increases.  [¶] [Mr.] Siazon has had several

---

[1] Mr. Siazon did not recall whether he received the termination letter or phone call first.  *See* Dolinko Decl., Ex. A (Siazon Depo. at 144-45).

United States District Court
Northern District of California

conversations with the SFO Management and Back Office team regarding his poor performance. After reviewing his employee file, there were only three write ups regarding job performance – tasks that were not complete or not completed correctly. Nothing indicated poor performance as a whole. Rosanna Nuti, City Operation Manager[,] provided a statement of what she recalled regarding [Mr.] Siazon's merit withholding but no other supporting documentation available. [¶] [Mr.] Siazon had never brought his merit increase inquiry to anyone in 2013 and 2014. Since the file is lacking documentation we will process the 2% merit increase for only 2014 as 2013 is now untimely." Dolinko Decl., Ex. S.

- October 27, 2015. In this complaint, Mr. Siazon maintained that Ms. Nuti favored certain employees. According to Mr. Siazon, Ms. Nuti "on numerous occasions puts her initials on the time card of a tardy employee in her protected list and write SC for schedule change to prevent this employee from being disciplined. Employees not in her protected list have to go thru [sic] the different levels of disciplinary actions including termination." Dolinko Decl., Ex. T (complaint). The complaint was investigated by several persons. The complaint was found unsubstantiated. "Admin Clerk 2556 timecards over a period of 4.5 months (June-October 2015) were pulled and reviewed. Upon review, [Ms.] Nuti's initials or 'sc' was not found." Dolinko Decl., Ex. T). Also, when interviewed, Ms. Nuti explained that "she would put her initials and shift change on drivers' timecards . . . when employees had doctors' appointments or family related events. It was done on the honor system." Dolinko Decl., Ex. T).

In his papers, Mr. Siazon contends that Hertz refused to rehire him because he made the above "hotline" complaints. *See* Opp'n at 11.

After making the above complaints with Hertz, Mr. Siazon filed a complaint with the California DLSE for waiting time penalties on November 19, 2015. *See* Dolinko Decl., Ex. Y (complaint). Approximately a year later, on October 17, 2016, the Labor Commissioner issued an order awarding Mr. Siazon penalties for nine days – more specifically, for not paying all wages

due on the date of discharge.  *See* Dolinko Decl., Ex. Z (Order at 2) (noting that Mr. Siazon was discharged on October 19, 2015, but did not receive his final wages until October 28, 2015).

The next day, on October 18, 2016, Mr. Siazon filed a charge of discrimination with the California DFEH.  In the charge, Mr. Siazon claimed, *inter alia*, age discrimination.  *See* Dolinko Decl., Ex. W (charge).

Based on, *inter alia*, the above evidence, Mr. Siazon asserts the following causes of action in the instant litigation:

(1) Wrongful termination in violation of public policy.

(2) Defamation.

(3) Violation of California Business & Professions Code § 17200.

(4) Age discrimination in violation of California Government Code § 12940.

(5) Retaliation in violation of California Government Code § 12940.

(6) Disability discrimination, failure to provide reasonable accommodation, and failure to engage in an interactive process in violation of California Government Code § 12940.

(7) Failure to prevent discrimination and retaliation in violation of California Government Code § 12940.

(8) Violation of California Labor Code § 1102.5 (no retaliation for whistleblowing) and representative claim pursuant to PAGA.  *See* Cal. Lab. Code § 2699.

In its motion for summary judgment, Hertz challenged all of the above claims.  In response, Mr. Siazon failed to make any argument on the claim for disability discrimination, failure to provide reasonable accommodation, and failure to engage in an interactive process.  Nor did he make any argument on the PAGA claim.  Therefore, the Court grants Hertz summary judgment on these two claims.  This leaves the following as Mr. Siazon's main claims: (1) age discrimination, (2) FEHA retaliation, (3) § 1102.5 retaliation, and (4) defamation.  The remaining claims are essentially derivative claims.  As discussed below, the Court finds that Hertz is entitled to summary judgment on the main claims and therefore the derivative claims as well.

A. Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B. Age Discrimination

The first of Mr. Siazon's main claims is the age discrimination claim. This claim is made pursuant to FEHA. *See* Cal. Gov't Code § 12940.

> In employment discrimination cases under the FEHA, California has adopted the three-stage burden-shifting test established by the United States Supreme Court [in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] to analyze disparate treatment claims of age discrimination. At trial, this test initially requires a plaintiff to establish a prima facie case of discrimination. The plaintiff must generally provide evidence that: (1) he was a member of a protected class [*e.g.*, 40 years of age or older], (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive [*e.g.*, the plaintiff was replaced by a significantly younger person[2]].
>
> If the plaintiff satisfies this prima facie burden at trial, a presumption of discrimination arises, and the defendant must put

---

[2] *See Hersant v. Dep't of Soc. Servs.*, 57 Cal. App. 4th 997, 1003 (1997).

> forth legitimate, nondiscriminatory reason for its actions. If the
> defendant does so, the plaintiff must then rebut these
> nondiscriminatory reasons with evidence of pretext.

*Dinslage v. City & Cty. of San Francisco*, 5 Cal. App. 5th 368, 378 (2016); *see also Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000 (noting that "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination, based on a theory of disparate treatment"). The plaintiff "'must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.'" *Id.*; *see also Guz*, 24 Cal. 4th at 356 (stating that, "[i]n an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias"); *Hicks v. KNTV Tel., Inc.*, 160 Cal. App. 4th 994, 1003 (2008) (stating that "[t]he plaintiff must do more than raise the inference that the employer's asserted reason is false" because "'[a] reason cannot be proved to be "a pretext *for discrimination*" unless it is shown both that the reason was false, and that discrimination was the real reason'") (emphasis in original).

1.    Prima Facie Case

In the instant case, Hertz argues that it is entitled to summary judgment because Mr. Siazon cannot even make out a prima facie of age discrimination. In particular, Hertz contends that there is no genuine dispute of material fact that (1) Mr. Siazon was not performing competently and that (2) Hertz did not act with a discriminatory motive. In turn, Mr. Siazon contends that there is sufficient evidence to create a genuine dispute of material fact on both elements.

a.    Competent Performance

Hertz maintains that there is no genuine dispute of material fact that Mr. Siazon was not performing competently as a Payroll Clerk because, before his termination, he was subject to multiple written warnings and a PIP.

In his opposition, Mr. Siazon argues that there is a genuine dispute of material fact with

13

respect to his competence because – even after he was terminated for alleged poor performance – he successfully obtained annual merit increases for the years 2013 and 2014.  Mr. Siazon points out that, after he was terminated, he made a complaint on Hertz's "hotline," noting that he was never given a pay increase, without any explanation why, once he started his job as an Office Clerk (*i.e.*, Payroll Clerk) in June 2012.  Mr. Siazon's complaint was investigated and found partially substantiated.  The investigation notes state in relevant part:

> [Mr. Siazon] was transferred into the Back Office clerk at [SFO] in May 2012.  Prior to this transfer he [was] a Counter Sales Rep, struggling in performance which is why he was moved to the clerk position.  Since 2012 and being trained and coached by other clerks and Managers[,] [Mr.] Siazon still continued to struggle with his administrative duties which resulted [in] the withholding of his annual merit increase in 2013 and 2014.  Unfortunately, there is not enough documentation on file that supports his performance was poor or it had been communicated to him that he would not be receiving the merit increases.

> [Mr.] Siazon has had several conversations with the SFO Management and Back Office team regarding his poor performance.  After reviewing his employee file, there were only three write ups regarding job performance – tasks that were not complete or not completed correctly.  Nothing indicated poor performance as a whole.  Rosanna Nuti, City Operation Manager[,] provided a statement of what she recalled regarding [Mr.] Siazon's merit withholding but no other supporting documentation available.

> [Mr.] Siazon had never brought his merit increase inquiry to anyone in 2013 and 2014.  Since the file is lacking documentation we will process the 2% merit increase for only 2014 as 2013 is now untimely.

Dolinko Decl., Ex. S (investigation notes); *see also* Figari Decl., Ex. A (Ex. A-120) (email from Ms. Tison, dated November 5, 2015) (stating that "[Mr.] Siazon's employee file did not have the proper documentation to support his merit increase withholding for 2013 & 2014[;] [t]here was no documentation that indicated poor performance for 2013 & 2014 and no confirmation that [Mr.] Siazon was made aware that he was not eligible for his annual increases," and, "[d]ue to the lack of documentation we are now obligated to pay [Mr.] Siazon a retro on his merit").[3]  Notably,

---

[3] Hertz has objected to Exhibit A-120 attached to the Figari Declaration.  *See* Reply at 2 n.1.  The objection is essentially moot given that Exhibit S attached to the Dolinko Declaration provides the same information.  Moreover, even if Ms. Nuti could not sponsor Exhibit A-120, presumably, Ms. Tison (the author) or Ms. Schneider (the recipient) could.  *Cf.* Fed. R. Civ. P. 56(c)(2) ("A party

although Ms. Tison found that there were documentation problems, she did not find that the written warnings were not given to Mr. Siazon. In fact, Mr. Siazon admitted receiving two written warnings in 2013 and another in 2014. *See* Dolinko Decl., Exs. L-N (written warnings signed by Mr. Siazon).

The retrospective annual merit increases for 2013 and 2014 by themselves are not enough to create a genuine dispute of material fact as to Mr. Siazon's competence. It appears that Hertz simply took the prudent course to give the annual merit increases based on a lack of documentation and the failure to properly notify Mr. Siazon that he would not be getting the increases. The fact that written warnings were actually given to Mr. Siazon is not in dispute. Moreover, Hertz awarded retrospective annual merit increases for the years 2013 and 2014 only. The problems in 2013 and 2014 did not affect other years. Mr. Siazon received warning notices in 2012 and 2015 as well; more specifically, he received a written warning in 2012, and another written warning and the PIP in 2015. Mr. Siazon only contemporaneously disputed one of the many written warnings he received. He presented no evidence showing the warnings were factually baseless or inaccurate.

Mr. Siazon argues still that there is additional evidence that creates a genuine dispute of material fact as to his competence. More specifically, Mr. Siazon notes that Hertz had him train other Payroll Clerks when they were hired, including, *e.g.*, Michelle Parenti and Ms. Alfonso (in 2014 and 2015, respectively). Mr. Siazon contends that, if his performance was not in fact competent, then Hertz would never have had him do the training in the first place. But this inference, even if drawn in Mr. Siazon's favor, does not gainsay the lengthy history of performance problems.

In sum, it appears there were substantial problems with Mr. Siazon's competence. The Court has serious doubts as to whether he has raised a triable issue of fact as to his competence. Nevertheless, for purposes of this order, the Court assumes that Mr. Siazon has offered sufficient evidence to support at least a prima facie case of competent performance.

---

may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

### b. Discriminatory Motive

Hertz contends that, even if there was a genuine dispute of material fact on competence, there is no genuine dispute of material fact on discriminatory motive. In response, Mr. Siazon argues that there is a genuine dispute of material fact on age-based animus based on the following evidence: (1) Mr. Siazon was replaced by a significantly younger person; (2) a significantly younger co-worker (Leonard Wojcichowski) engaged in misconduct but was not as severely disciplined as Mr. Siazon was, and (3) significantly younger co-workers (Ms. Dizon and Ms. Alfonso) made errors as Payroll Clerks but received no written discipline.

The Court is not persuaded by Mr. Siazon's second and third arguments. With respect to the second argument, the alleged misconduct of Mr. Wojcichowski was entirely different in nature from the alleged performance problems of Mr. Siazon. *See* Figari Decl., Ex. A (Nuti Depo. at 141) (testifying that "something happened, I'm not sure what, but it caused [Mr. Wojcichowski] to become very angry, I guess, at the computer, where he then made a profane gesture[;] [b]asically he flipped the computer off, and [a co-worker] saw it and[she] thought that it was directed at her and became highly offended by it"). Furthermore, there is no evidence that Mr. Wojcichowski had a lengthy history of performance issues as Mr. Siazon did. *Cf. Vasquez v. Cty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) (in national origin discrimination case, noting that alleged comparators were "not similarly situated" to plaintiff – *e.g.*, one "did not engage in problematic conduct of comparable seriousness to that of [plaintiff]"); *Wall v. Nat'l R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (in race discrimination case, noting that "[t]he three white employees who were not discharged for conduct similar to that for which [plaintiff] was discharged had no prior disciplinary records[;] [w]hen warranted by the circumstances, an employer may discipline repeat offenders more severely than first-time offenders").

As for the third argument, it is not entirely clear from the record what all of the alleged errors of the co-workers were; but even if the co-workers made some errors comparable to those made by Mr. Siazon, there is nothing in the record establishing that the co-workers had repeat performance issues. *See, e.g.*, Figari Decl., Ex. C (Jocson-Hynson Depo. at 42-44) (testifying that the other clerks "[s]ometimes" made mistakes). Moreover, Mr. Siazon has not established a

pattern of favoritism towards similarly situated younger workers. *Cf. Guz*, 24 Cal. 4th at 367-68 (stating that "the premise that [the employer] purposely favored two workers on the basis of youth when deciding which BNI-MI employees to retain is weakened, for statistical purposes, by the small size of that unit, which included only six persons").

The critical question, therefore, is whether Mr. Siazon's first argument has merit. According to Hertz, Mr. Siazon cannot establish even a prima facie case of discrimination because no one was ever hired to replace him; instead, his job duties were simply assumed by existing co-workers. Mr. Siazon argues that there is evidence that he was, in effect, replaced by a significantly younger person. More specifically, Mr. Siazon contends that, at least as of November 2014, Hertz intended to replace him with someone younger. He points to a written warning from November 2014 (issued by Ms. Kim), which stated: "You recently requested vacation on November 16th and 17th. Before a manager had given authorization for this request, you purchased airline tickets as if you were granted the time off. In fact, your co-worker still has not been trained to *replace* you and some of your projects are overdue." Dolinko Decl., Ex. N (written warning) (emphasis added). But, as Hertz argues, "it is obvious from the context that . . . 'replace' Plaintiff [as mentioned in the November 2014 written warning simply] meant [that] the co-worker had not yet been trained to replace him *while he was on vacation*." Reply at 6-7 (emphasis in original). Nothing suggests an intent in November 2014 to terminate Mr. Siazon and ask him to train his permanent replacement.

Moreover, an intent to terminate as of November 2014 cannot reasonably be inferred given that Mr. Siazon was not actually fired until almost a year later, in October 2015. Mr. Siazon acknowledges that he was not actually fired until October 2015, and this was after further warnings and the PIP. However, he maintains that the delay in his being replaced was simply happenstance. According to Mr. Siazon, in or about November 2014, Ms. Parenti was the younger Payroll Clerk hired to replace him but, she ended up quitting after a brief time, which led to Mr. Wojcichowski (also younger) being hired. Mr. Wojcichowski was transferred (because of the above-described incident with a co-worker), which then led to Ms. Alfonso – again, younger – being hired. Mr. Siazon maintains that Ms. Alfonso was, in effect, his replacement not only

because of the above sequence of events but also because of the fact that, after he was terminated, she assumed at least a major part of his job responsibilities.

Mr. Siazon's replacement theory is problematic. Notably, it appears that Ms. Alfonso was working for Hertz at least as early as April 2015. *See* Figari Decl., Ex. A (Ex. A-121) (email, dated April 2, 2015, addressed to multiple persons, including Ms. Alfonso). Mr. Siazon, however, still was not terminated *until some six months later*, in October 2015. Mr. Siazon has not produced evidence showing Ms. Alfonso was hired because of (and thus after) a decision was made to terminate him and replace him with Ms. Alfonso.

At best, Mr. Siazon can establish that, upon his termination, his job duties were assumed by existing co-workers who were younger. Although Mr. Siazon has offered evidence that a significant part of his job duties were assumed by Ms. Alfonso, who is substantially younger, these facts are not as compelling as when an employer simply hires a younger person to replace an older Plaintiff. *See, e.g.*, *Hersant v. Dep't of Soc. Servs.*, 57 Cal. App. 4th 997, 1003 (1997) (indicating that there is a prima facie case of discriminatory motive where "the employee was replaced in his position by a significantly younger person"). In fact, some courts have found that similar circumstances do not establish replacement by a younger worker. *See Selby v. Pepsico, Inc.*, 784 F. Supp. 750, 755 (N.D. Cal. 1991) (rejecting plaintiff's argument that he was replaced by a younger worker when his position was eliminated and his work reassigned to the retained employees), *aff'd* 994 F.2d 703 (9th Cir. 1995); *Holtzclaw v. Certainteed Corp.*, 795 F. Supp. 2d 996, 1011 (E.D. Cal. 2011) (noting that plaintiff was not replaced; instead his "job duties were primarily assumed by [existing employees], to whatever degree, in addition the duties already performed in their respective positions") (emphasis omitted). *But see Rodriguez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58-59 (1st Cir. 2005) (finding that the district court erred in instructing the jury that a plaintiff is replaced only where the employer hires a new employee or designates a current employee as the plaintiff's replacement; "to establish the replacement element, [the plaintiff simply] had to show that [the employer] had a continuing need for the work that she was performing prior to her termination").

Mr. Siazon presents no other evidence of Hertz's discriminatory motive on the basis of

18

United States District Court
Northern District of California

age.  He presents no data showing employment disparity in the workplace along the lines of age.

Nor has he presented any evidence of a pattern of discrimination other than the alleged examples

of favoritism discussed above.  He presents no evidence of ageist slurs or comments by his

supervisors.

Accordingly, the evidence of discriminatory motive is weak.  Nevertheless, as above, the

Court assumes that Mr. Siazon has offered sufficient evidence to support at least a prima facie

case of discriminatory motive.

### 2. Legitimate Business Reason and Pretext

Even if Mr. Siazon has presented sufficient evidence to establish a prima facie case of age

discrimination (a highly doubtful proposition), he has failed to present a triable issue on pretext.

At this stage of the analysis, the Court must consider whether Hertz had a nondiscriminatory

reason for its adverse employment action(s).  According to Mr. Siazon, Hertz took two adverse

employment actions: (1) terminating him and then (2) not rehiring him.  As noted above, Hertz has

offered substantial evidence that it terminated and/or did not rehire Mr. Siazon because of his poor

job performance.

The burden thus shifts to Mr. Siazon.  He "'must offer substantial evidence that [Hertz's]

stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence

[Hertz] acted with a discriminatory animus, or a combination of the two, *such that a reasonable

trier of fact could conclude the employer engaged in intentional discrimination*.'"  *Dinslage*, 5

Cal. App. 5th at 378 (emphasis added); *see also King v. United Parcel Service, Inc.*, 152 Cal. App

4th 426, 433 (to avoid summary judgment, employee "must produce *substantial* responsive

evidence to show that [the employer's] ostensible notice was pretextual.") (emphasis added);

*accord Guz*, 24 Cal. 4th at 356 (stating that, "[i]n an appropriate case, evidence of dishonest

reasons, considered together with the elements of the prima facie case, may permit a finding of

prohibited bias"; citing, *inter alia*, *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148-

49 (2000)).  Notably, in *Reeves*, a case involving alleged employment discrimination in violation

of federal law, the Supreme Court noted that "a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, may permit the trier of

19

1  fact to conclude that the employer unlawfully discriminated," but

> [t]his is not to say that such a showing by the plaintiff will always be
> adequate to sustain a jury's finding of liability. *Certainly there will
> be instances where, although the plaintiff has established a prima
> facie case and set forth sufficient evidence to reject the defendant's
> explanation, no rational factfinder could conclude that the action
> was discriminatory.* For instance, an employer would be entitled to
> judgment as a matter of law if the record conclusively revealed some
> other, nondiscriminatory reason for the employer's decision, or if the
> plaintiff created only a weak issue of fact as to whether the
> employer's reason was untrue and there was abundant and
> uncontroverted independent evidence that no discrimination had
> occurred.

*Reeves v*, 530 U.S. at 148 (emphasis added).

The Court finds that the instant case falls into the latter category contemplated by *Reeves*.
At best, Mr. Siazon has created only a weak issue of fact as to whether Hertz's asserted
nondiscriminatory reason for its action (*i.e.*, poor performance on the part of Mr. Siazon) was
untrue. Multiple written warnings were issued to Mr. Siazon, and there is nothing to suggest that
the written warnings were made up. Indeed, as noted above, Mr. Siazon refused to sign only one
of the many written warnings. Thus, it is of little consequence that – as Mr. Siazon claims – the
written warnings were not maintained in his official personnel file and instead were kept in some
other file maintained by Ms. Schneider of Human Resources. While documentation by Hertz may
have been deficient, Mr. Siazon has produced practically no evidence disputing the accuracy of the
numerous write ups and warnings given to him over the years. There is no evidence that the
factual basis for the many write-ups were untrue.

As there is no evidence that all the write-ups were false or inaccurate, the only evidence of
a discriminatory motive is the evidence that Mr. Siazon was, in effect, replaced by a significantly
younger person or that his primary job duties were assumed by a significantly younger existing
employee. The evidence here is not enough at the final stage of *McDonnell Douglas*. As some
courts have noted, "[t]he replacement of an older worker with a younger worker or works does not
itself prove unlawful discrimination." *Fagan v. N.Y. State Elec. & Gas Corp.*, 186 F.3d 127, 134
(2d Cir. 1999). "Typically, younger workers will replace older ones; this is an unremarkable

phenomenon that does not, in and of itself, prove discrimination."[4]  *Futrell v. J.I. Case*, 38 F.3d 342, 348 (7th Cir. 1994) (although adding that "such evidence does contribute to an age discrimination proof when combined with other factors"); *see also Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007) (holding that summary judgment was properly granted in favor of defendants because the plaintiff "present[ed] no evidence, other than her replacement by a younger woman, indicating KCPD's proffered reasons for her termination were a pretext for age discrimination"); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 767 (D.C. Cir. 2002) (at summary judgment, stating that "[t]he Teamsters' decision to replace [the plaintiff] with a younger woman is insufficient for a jury to conclude that she 'lost out *because of [her] age*'") (emphasis in original); *cf. Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 509, 512 (4th Cir. 1994) (affirming judgment as a matter of law in favor of defendant because "plaintiffs lacked any substantial evidence of age bias"; "the mere fact of replacement by a younger employee is not dispositive of age discrimination" because, "[i]f it were, it would transform the ADEA into something akin to a strict seniority protection system"); *Little v. Republic Ref. Co.*, 924 F.2d 93, 98 (5th Cir. 1991) (in affirming judgment notwithstanding the verdict, stating that the plaintiff's "reliance upon the fact that his replacement was 39-years-old provides an insufficient basis to support the jury's verdict[;] [t]his fact was properly considered in establishing [the plaintiff's] prima facie case, but it is clearly insufficient for [the plaintiff's] ultimate burden of proving intentional age discrimination").  Thus, that fact alone, without any other evidence of discriminatory motive, would not likely suffice to prove pretext.  In any event, as discussed above, the evidence in this case is even weaker.  Mr. Siazon was not in fact "replaced" by younger workers.  Mr. Siazon has not produced "substantial responsive evidence" of pretext.  *King*, 152 Cal. App. 4th at 433.  The Court thus grants Hertz

---

[4] *Cf. De Minico v. Monarch Wine Co.*, No. CV 85-0238 PAR, 1986 U.S. Dist. LEXIS 28637, at *12-13 (C.D. Mar. 3, 1986) (in a reduction-in-force case, holding that it is not enough to show that younger employees assumed the job duties of the plaintiff, even for a prima facie case – "'it is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are often moving out of the labor market, while younger ones move in'"; also, "the inference of age discrimination in a reduction in force case, where the consolidated responsibilities are taken over by a qualified younger person already a part of the company, is necessarily less than when a person protected by the ADEA is refused a position for which he is qualified, and a younger person subsequently hired").

summary judgment on the claim for age discrimination.

C.    FEHA Retaliation

The second of Mr. Siazon's main claims is a retaliation claim under FEHA.

California Government Code § 12940(h) provides that "[i]t is an unlawful employment practice . . . [f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the California Fair Employment and Housing Act ('FEHA')] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." Cal. Gov't Code § 12940(h).

> "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." If the plaintiff establishes a prima facie case, the burden shifts to the employer to identify "a legitimate, nonretaliatory reason for the adverse employment action." The burden then "shifts back to the employee to prove intentional retaliation."

*Cornell v. Berkeley Tennis Club*, 18 Cal. App. 5th 908, 942 (2017).

In the instant case, Hertz challenges the retaliation claim on two grounds (both related to a plaintiff's prima facie case): (1) there is insufficient evidence that Mr. Siazon engaged in protected activity and (2) there is insufficient evidence establishing a causal link between any alleged protected activity and the alleged adverse employment action. The Court need not address the second argument because the first argument is meritorious and a sufficient basis for granting Hertz summary judgment.

In his opposition brief, Mr. Siazon argues that he engaged in protected activity when he "made complaints of harassment and discrimination on September 24, 2013 and July 24, 2014." Opp'n at 20. The complaints that Mr. Siazon refers to are as follows:

- On September 24, 2013 – *i.e.*, a few days after a written warning about poor job performance from Ms. Nuti – Mr. Siazon wrote a memo to Mr. Smith, then then-General Manager. The memo was Mr. Siazon's "formal complaint of intimidation and harassment by Bernadette Hynson-Jocson [the Senior or Lead Payroll Clerk], made possible with the approval of Rosanna Nuti." Dolinko Decl., Ex. U

(complaint). The memo did not use the term "discrimination." Nor did the memo provide specifics about the alleged intimidation and harassment; Mr. Siazon simply indicated that he had not been "treated fairly and with respect." Dolinko Decl., Ex. U). Mr. Siazon asked for the opportunity to speak to Mr. Smith "personally in detail as to why I feel this way before any action is initiated." Dolinko Decl., Ex. U). According to Mr. Siazon, he subsequently met with Mr. Smith as well as a senior Human Resources employee (Larry Keyes). *See* Dolinko Decl., Ex. A (Siazon Depo. at 164). No evidence indicates that the conversation ever addressed the topic of discrimination.

- On July 24, 2014, Mr. Siazon wrote a memo to Mr. Hopkins, the General Manager over SFO. The memo was Mr. Siazon's "formal complaint of intimidation and harassment" by Ms. Kim, the Location Manager. Dolinko Decl., Ex. V (complaint). Like the complaint above, no mention was made in the complaint about discrimination. According to Mr. Siazon, a few days earlier, Ms. Kim came up to him "without any cordiality" and "ordered me to open my email." Dolinko Decl., Ex. V). There was an email from Ms. Nuti telling Mr. Siazon to start working on "VSA productivity tracking." Dolinko Decl., Ex. V. Before Mr. Siazon could ask any questions, Ms. Kim also told him that he needed "to do the 7 day No-Rev." Dolinko Decl., Ex. V. Mr. Siazon stated that Ms. Kim seemed angry and that "her demeanor was a very humiliating experience." Dolinko Decl., Ex. V. Mr. Siazon and Ms. Kim then had a discussion regarding his assigned workdays – *e.g.*, why Ms. Kim had removed him from weekends off and why she had assigned him No-Rev on days that the task was difficult to do. Ms. Kim refused to change his schedule and then "instructed me to submit to her what I do every day stating the number of hours it took me to finish." Dolinko Decl., Ex. V. After Ms. Kim left, Mr. Siazon asked a co-worker if she had to "report what she does, stating the number of hours to finish." Dolinko Decl., Ex. V. The co-worker said "no." According to Mr. Siazon, after he made the complaint, Mr. Hopkins said

23

that he had spoken with Ms. Kim and that it would not happen again.  *See* Dolinko

Decl., Ex. A (Siazon Depo. at 190, 192).

The problem for Mr. Siazon is that, although he did make the above complaints, there is no indication that he was making a complaint *about conduct that was unlawfully discriminatory under the FEHA* – or even that he reasonably and in good faith believed to be discriminatory.  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1043 (2005) (stating that "an employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA").  Mr. Siazon did not complain that Ms. Jocson-Hyson, Ms. Nuti, and/or Ms. Kim was engaging in age discrimination or discrimination based on any other protected category (*e.g.*, race, religion).  Mr. Siazon simply indicated that he was allegedly being harassed or intimidated.  At the argument herein, Mr. Siazon's counsel conceded that he never complained to Hertz about age discrimination.  General harassment or mistreatment, absent discrimination on a prohibited basis, is not actionable under the FEHA.  *See Mayfield v. Sara Lee Corp.*, No. C 04-1588 CW, 2005 U.S. Dist. LEXIS 42458, at *22-23 (N.D. Cal. Jan. 13, 2005) (stating that, "to constitute protected activity, [plaintiff] must have alerted his employer to his belief that discrimination, not merely unfair personnel treatment, had occurred").

The Court therefore grants Hertz summary judgment on the FEHA retaliation claim.

D.      <u>Section 1102.5 Retaliation</u>

Mr. Siazon brings a retaliation claim not only under FEHA but also under California Labor Code § 1102.5.  The latter retaliation claim is his third main claim for relief.

Section 1102.5 provides in relevant part that

> [a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency [or] to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable

> cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

Cal. Lab. Code § 1102.5(b).  A plaintiff establishes a prima facie case of retaliation by showing that "(1) [he] engaged in a protected activity, (2) [his] employer subjected [him] to an adverse employment action, and (3) there is a causal link between the two." *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).  If the plaintiff can establish a prima facie case of retaliation, then "the defendant [must] provide a legitimate, nonretaliatory explanation for its acts, and . . . [then] the plaintiff [must] show this explanation is merely a pretext for retaliation." *Id.*

In the instant case, Mr. Siazon asserts that his protected activity was a disclosure of information to a person with authority over him as an employee *and* a disclosure to a government or law enforcement agency.  But, as discussed below, none of the factual predicates he identifies is enough to sustain a retaliation claim.

As an initial matter, the Court notes that the purpose behind § 1102.5 is "to encourage employees to [come forward] when they have reason to believe their employer is violating laws enacted for the protection of corporate shareholders, investors, employees, and the general public." 2003 Cal. SB 0777 (§ 1).  Thus, where a plaintiff simply makes a disclosure as an internal personnel matter, that is not a sufficient predicate for a § 1102.5 claim.  For example, in *Patten*, the plaintiff was a school principal.  She disclosed to district superiors "for personnel action" "complaints from female students that a male physical education (P.E.) teacher at Foothill was peering into the girl's locker room," as well as an "off-color remark that a male science teacher at Foothill had made to a female student." *Patten*, 134 Cal. App. 4th at 1382.  She also made a disclosure related to school safety; more specifically, after a student was assaulted on the Foothill campus, she requested "additional staff to keep the campus safe." *Id.*  The court held that "[t]he disclosures involving the two teachers do not amount to whistleblowing as a matter of law because [they] indisputably encompassed only the context of internal personnel matters involving a supervisor and her employee, rather than the disclosure of a legal violation." *Id.* at 1384-85 (emphasis omitted).

[R]egarding the more serious of the two teacher matters (the P.E. teacher), she merely "forwarded complaints by students of inappropriate conduct of a Foothill … P.E. teacher [] on September 12, 2001, to [the] Assistant Superintendent of Human Resources . . . , District Legal Counsel . . . , and [the] Assistant Superintendent of Educational Services . . . for personnel action." Patten's disclosure regarding the science teacher similarly was made solely in the context of an internal personnel matter based on a student complaint, rather than in the context of a legal violation.

To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected "whistleblowers" arising from the routine workings and communications of the job site.

*Id.* at 1385 (emphasis omitted). The court also found that the disclosure about "needing more staff for safety purposes do not amount to whistleblowing as a matter of law. Again, these disclosures were made in an exclusively internal administrative context. They do not show any belief on Patten's part that she was disclosing a violation of state or federal law in any sort of whistleblowing context, as required for a section 1102.5(b) whistleblowing action." *Id.*; *see also Fusco v. Sonoma Cty. Junior Coll. Dist.*, No. C-09-0114 MMC, 2010 U.S. Dist. LEXIS 7363, at *10-11 (N.D. Cal. Jan. 29, 2010) (where plaintiff complained about disruptive students who posed a safety concern, stating that plaintiff "has failed to allege her purpose at the time of such communication was to 'blow the whistle'"); *Conn v. W. Placer Unified Sch. Dist.*, 186 Cal. App. 4th 1163, 1182 (2010) (stating that "[t]he evidence adduced at trial showed that in making her complaints Conn was attempting to secure special education services for her own children and certain students in her class, not 'blow the whistle'"); *cf. Mueller v. Cty. of L.A.*, 176 Cal. App. 4th 809, 822 (2009) (stating that "this case is not about perceived violations of federal or state statutes, rules or regulations but rather about perceived violations of the department's own policies, which are local policies"; adding that "[m]atters such as transferring employees, writing up employees, and counseling employees are personnel matters").

In the instant case, there does not appear to be any evidence that, when Mr. Siazon came forward with his complaints, he was doing so to "blow the whistle" on a legal violation as opposed to alerting Hertz about an internal personnel matter.

Moreover, even if Mr. Siazon could overcome the *Patten* problem, the Court would still conclude that none of the factual predicates identified by Mr. Siazon is enough to support a retaliation claim. For example:

- On September 24, 2013, Mr. Siazon made a complaint to the then-General Manager that Ms. Jocson-Hynson was intimidating and harassing him. Mr. Siazon maintains that this complaint led to his being terminated (the adverse employment action). But "[p]rior to 2014, an employee only engaged in protected conduct within the meaning of Section 1102.5 by disclosing information *to a government agency* regarding a reasonable belief that his employer engaged in illegal activity." Reply at 11 n.5 (emphasis added); *see also* 2013 Cal. SB 666 (adding text regarding disclosure to employer; effective January 1, 2014); *Navarro v. DHL Glob. Forwarding*, No. 2:15-cv-05510-CAS (Ex), 2017 U.S. Dist. LEXIS 32663, at *29-30 (C.D. Cal. Mar. 6, 2017) (noting that, "[i]n 2014, the statute was amended to protect employee complaints, like plaintiff's, 'to a person with authority over the employee'"; "'[u]nder the 2013 version of § 1102.5, only complaints or reports made to a governmental agency are protected [and] complaints or reports made "internally" to the employer are not protected'"). Furthermore, even if Mr. Siazon reasonably believed that his complaint about intimidation and harassment somehow disclosed a violation of local, state, or federal law, it is hard to see the causal connection between his complaint and his termination. Mr. Siazon made his complaint in September 2013; he was not terminated until October 2015. *See Dowell v. Contra Costa Cty.*, 928 F. Supp. 2d 1137, 1156 (N.D. Cal. 2013) ("Plaintiff must plead a causal link between her disclosure of what she had reasonable cause to believe constituted Defendants' illegal conduct, and Defendants' adverse actions. Causation may be inferred from circumstantial evidence, including 'the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.'"). And the earliest that Hertz appeared

27

to contemplate a PIP was March 2015.  *See* Figari Decl., Ex. A (Ex. A-113) (email from Ms. Jocson-Hynson) (forwarding an email that she had written to Mr. Siazon and asked Ms. Nuti to "[p]lease add to PIP").  According to Mr. Siazon, "'[a] long period between an employer's adverse employment action and the employee's earlier protected activity' still supports an inference of a causal connection 'if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent.'"  Opp'n at 20.  But the first written warning that Hertz issued after the September 2013 complaint did not take place until November 2014 – *i.e.*, more than a year later.  The lack of proximity between the asserted protected activity and the alleged retaliation does not support a claim of retaliation.  *Cf. Adetuyi v. City & Cty. of S.F.*, 63 F. Supp. 3d 1073, 1090 (N.D. Cal. 2014) (in Title VII retaliation case, noting that "a one year lapse [between the protected activity and adverse employment action] generally does not support an inference of causation").

- Sometime before being terminated, Mr. Siazon complained about not getting merit increases in 2013 and 2014.  *See* Opp'n at 8, 17 (citing Figari Decl., Ex. D (Schneider Depo. at 56-57) and Figari Decl., Ex. B (Hopkins Depo. at 109)).  Mr. Siazon maintains that this complaint led to his being terminated.  The problem for Mr. Siazon is that he has not identified evidence with any precision as to *when* he made this complaint about the annual merit increases and, without this information, he cannot establish a causal connection between the complaint and the termination.[5]

- On October 21, 2015, Mr. Siazon made a complaint on Hertz's "hotline" that Joseph Magri, a Transporter, was being favored and was engaging in wasteful conduct.  *See* Dolinko Decl., Ex. R (complaint).  Ms. Siazon asserts that this

---

[5] The Court notes that record clearly establishes that Mr. Siazon made a complaint about the annual merit increases on October 27, 2015, *after* being terminated.  Mr. Siazon's claim here that he also made a complaint *before* being terminated is not clearly supported by evidence.

compluint led to his not being rehired.[6] *Cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) ("hold[ing] that former employees are included within § 704(a)'s coverage" for retaliatory discrimination; indicating agreement with the position that exclusion "would undermine the effectiveness of Title VII by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC, and would provide a perverse incentive for employers to fire employees who might bring Title VII claims"). *See, e.g.*, *Maynard v. Motors Mgmt. Corp.*, No. 05-CV-1089, 2006 U.S. Dist. LEXIS 62508, at *38-39 (D. Minn. Aug. 31, 2006) (in Title VII case where plaintiff alleged that she was not rehired in retaliation for a statement she made about the treatment of women, finding an issue of material fact as to causation where plaintiff made her statement "less than a week prior to her being informed she would not be rehired"). As Hertz argues in its reply, this factual predicate is problematic because it is not clear what legal violation was alleged to have taken place. For example, Mr. Siazon's complaint about wasteful conduct (*i.e.*, using trucks to hold recycling rather than actively using them in the business) might have been harmful to the company from a profit perspective but that would not appear to be a legal violation.

- On October 27, 2015, Mr. Siazon claimed that he was never given a pay increase, without any explanation why, once he started his job as an Office Clerk (*i.e.*, Payroll Clerk) in June 2012. Mr. Siazon contends that this complaint led to his not being rehired. But there is no indication that Mr. Siazon brought up the issue to "blow the whistle" as opposed to raising an internal personnel matter. Hertz's cases cited above hold such a complaint about internal personnel matters does not

---

[6] According to Mr. Siazon, he had previously asked Mr. Hopkins via email – on October 19, 2015 – to reinstate him. *See* Mot. at 11; Figari Decl., Ex. B (Ex. B-128) (email) (stating "I hope to hear from you regarding this matter the soonest possible at your convenience" and "I will wait for you confirmation regarding this matter since it is not consistent with what we have agreed upon"); Figari Decl., Ex. B (Hopkins Depo. at 43-4) (in response to the question, "[W]as Mr. Siazon communicating to you that he wanted to come back to Hertz," stating: "Based on the email, perhaps[,] [b]ut they can't really petition to me for something like that"). Mr. Siazon points to no evidence of a clear request to be rehired.

29

give rise to a whistleblower retaliation claim. Moreover, it is hard to say that Hertz retaliated against Mr. Siazon when, ultimately, Hertz found the complaint partially substantiated and gave him a merit increase for 2014 at least (even if it did not rehire him). Also, while there can be postemployment retaliation, *see id.*, Mr. Siazon has not produced any evidence that, *e.g.*, a specific decision was made not to rehire him shortly after he made his "hotline" complaint. Indeed, as noted there is no clear evidence of a specific request by Mr. Siazon to be rehired.

- On November 19, 2015 Mr. Siazon filed a complaint with the California DLSE for waiting time penalties. *See* Dolinko Decl., Ex. Y (complaint). Mr. Siazon maintains that this complaint led to his not being rehired. Similar to above, this factual predicate in support of a retaliation claim is weak because there is no indication that Mr. Siazon was bringing up the issue to "blow the whistle" as opposed to getting an internal personnel matter resolved. And for the reasons stated above, there is no evidence of a causal connection – *i.e.*, a request and then refusal to rehire predicated on this complaint with the DLSE.

For the foregoing reasons, the Court grants Hertz summary judgment on the § 1102.5 retaliation claim.

E. <u>Derivative Claims: Wrongful Discharge in Violation of Public Policy, Failure to Prevent Discrimination and Retaliation, and Violation of § 17200</u>

Mr. Siazon has brought several claims that are derivative of his FEHA age discrimination, FEHA retaliation, and § 1102.5 retaliation claims – *i.e.*, the claims for wrongful discharge in violation of public policy, failure to prevent discrimination and retaliation, and violation of § 17200. Because the Court has held that Hertz is entitled to summary judgment on the age discrimination and retaliation claims, the derivative claims also fail.

F. <u>Defamation</u>

The fourth main claim for relief is the defamation claim.

In his complaint, Mr. Siazon indicates that false statements were made "regarding [his] work performance, integrity, competence, honesty, and ethics," Compl. ¶ 9, including statements

that he "[v]iolated HERTZ'S Code of Conduct [and] [h]ad a poor job performance." Compl. ¶ 10. Mr. Siazon alleged that "[t]hese statements were made to HERTZ employees, including but not limited to HERTZ's Human Resources and Managers, and were also repeated to Plaintiff's future potential employers and colleagues," Compl. ¶ 11 – the latter apparently so as to explain "the reason he was no longer employed with Defendants." Compl. ¶ 12; *see also* Dolinko Decl., Ex. A (Siazon Depo. at 186) (testifying about "[m]y friends from Hertz calling me I have to ignore because of the embarrassment of them knowing of what happened to me").

Hertz moves for summary judgment on the defamation claim on two grounds: (1) there is insufficient evidence that it ever made any false statements and (2) any asserted false statements would, in any event, be privileged. Both of Hertz's arguments have merit.

As to (1), the Court first bears in mind that it is not entirely clear what exactly the false statements were (and who made them). Even if the Court were to accept Mr. Siazon's vague assertion that Hertz falsely stated that Mr. Siazon's performance was poor, that opinion did have some factual basis. *See Bently Res. LP v. Papaliolios*, 218 Cal. App. 4th 418, 427 (2013) (stating that "an opinion based on implied, undisclosed facts is actionable if the speaker has *no* factual basis for the opinion") (internal quotation marks omitted; emphasis added). As noted above, Mr. Siazon was subject to multiple written warnings plus a PIP. Notably, the majority of the written warnings were not challenged by Mr. Siazon.

With respect to (2), "[d]efamation requires that the allegedly false statement be unprivileged." *Harkonen v. Fleming*, 880 F. Supp. 2d 1071, 1079 (N.D. Cal. 2012). California Civil Code § 47(c) provides that a privileged publication is one made

> [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.

Cal. Civ. Code § 47(c). The defendant has the burden of establishing that statements are privileged under § 47(c); "if it succeeds, [the] plaintiff[] must show the statements were made with actual malice in order to rebut the privilege." *Raynal v. Nat'l Audubon Soc'y Inc.*, No. 11-cv-05599 NC, 2012 U.S. Dist. LEXIS 166694, at *20-21 (N.D. Cal. Nov. 21, 2012). "Malice, for the

purposes of the common interest privilege, is defined as 'motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the [communication] and therefore acted in reckless disregard of the plaintiff's rights.'" *Id.* at *21.

In the instant case, the common interest privilege applies because, based on the evidence of record, any statements about Mr. Siazon's job performance seem to have been made by and/or to managers, Human Resources employees, and/or senior employees, all of whom were involved with evaluating or providing information on his job performance. *See* Schneider Decl. ¶ 10 (testifying that "[w]e discuss employee performance issues only on a need-to-know basis"). For example, Ms. Schneider of Human Resources communicated with Mr. Siazon's managers (Mr. Hopkins and Ms. Nuti) and Ms. Jocson-Hynson as Senior or Lead Payroll Clerk about Mr. Siazon's job performance because "[t]hese were individuals who either needed to know about Mr. Siazon's performance issues and/or were employees who were able to provide me with feedback regarding Mr. Siazon's job performance." Schneider Decl. ¶ 8. There is no indication that statements were made to persons who did not "need to know." Notably, Mr. Siazon failed to address the common interest privilege in his papers.

To the extent Mr. Siazon suggests that some unnamed friends at Hertz knew about his termination, plus the alleged reason for the termination, there is an insufficient record as to the underlying circumstances – *e.g.*, how did the friends learn about the termination and the alleged reason for it? Absent more specific facts about what was said and to whom, Mr. Siazon has failed to state a claim.

The Court thus grants Hertz summary judgment on the claim for defamation.

G.    Punitive Damages

Finally, Hertz moves for summary judgment on the issue of punitive damages.[7] Because the Court is granting Hertz summary judgment on all causes of action, Hertz's argument on

---

[7] In his opposition, Mr. Siazon makes a procedural objection to the punitive damages issue. More specifically, he argues that Hertz untimely raised the issue through a notice of errata that was filed one week after the summary judgment motion was filed. This objection lacks merit. Hertz filed the notice of errata only because it left out the punitive damages issue in its *list* of issues for which it sought summary judgment. However, the original summary judgment motion contained *briefing* on the punitive damages issue. Thus, Mr. Siazon has not been prejudiced in any way.

punitive damages is moot.

### III. CONCLUSION

Hertz is entitled to summary judgment on all causes of action asserted by Mr. Siazon in his complaint. The Court therefore directs the Clerk of the Court to enter a final judgment in accordance with this opinion and close the file in this case.

This order disposes of Docket No. 43.

**IT IS SO ORDERED**.

Dated: March 13, 2019

_____
EDWARD M. CHEN
United States District Judge